UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-21298-CIV-BLOOM/SELTZER

**JORGE NUNEZ**, *as personal representative*
*of the estate of* LUIS ENRIQUE NUNEZ, *deceased*,

      Plaintiff,

v.

**CITY OF HIALEAH**, *et al.*,

      Defendants.[1]
_____/

## ORDER DENYING MOTION TO ENFORCE SETTLEMENT AGREEMENT

**THIS CAUSE** came before the Court on Defendant City of Hialeah's Motion to Enforce Settlement Agreement, ECF No. [6] (the "Motion"). The Court is fully advised after review of the Motion, the parties' briefs, the record (including the transcript of the motion hearing held on August 20, 2014, ECF No. [42]), and the applicable law.

**I.     Background**

Plaintiff filed the instant action in state court on February 15, 2014 for excessive force, under 42 U.S.C. § 1983, and for wrongful death, intentional infliction of emotional distress, mental anguish, and negligence under Florida law after Luis Enrique Nunez was shot and killed by City of Hialeah police officers responding to a 911 call made on February 18, 2012. *See generally* ECF No. [1-1].

---

[1] Plaintiff filed an amended complaint replacing Bismark Nunez, individually and as executor de son tort of Luis Enrique Nunez, with Jorge Nunez, as personal representative of the estate of Luis Enrique Nunez, deceased. The amended complaint also added additional defendants to replace the John Doe officers. *Compare* ECF No. [1-1] *with* ECF No. [43]. The Clerk sent a notice to Plaintiff indicating a failure to add these parties and requiring Plaintiff to file a Notice of Entry of Parties, *see* ECF No. [44], to which Plaintiff complied. *See* ECF No. [45]. Defendant filed an unopposed motion for extension of time to respond to the amended complaint, ECF No. [46], one week after the amended complaint was filed. By virtue of filing this motion, Defendants have conceded that the filing of the amended complaint was procedurally proper and has waived any objection. Thus, the docket has been corrected to reflect only Jorge Nunez, as personal representative of the estate of Luis Enrique Nunez, deceased, as Plaintiff in this action.

Once Defendant became aware of the instant lawsuit on March 17, 2014, the attorney for Defendant, William M. Grodnick, Esq., contacted Plaintiff's attorney at the time, Phillip G. Mitchell, Esq., and the two attorneys discussed the case and potential settlement. The purported agreement had three key components: 1) payment of $140,000 by Defendant to Plaintiff, 2) a general release, and 3) an apology letter from Defendant. *See, e.g.*, ECF No. [6] at 3.

On March 21, 2014, Mr. Mitchell e-mailed Mr. Grodnick stating "[a]ttached is the W-9. Please have the check made out to "Mitchell & West, LLC Trust Account" and on the memo line have the name of the parties." ECF No. [6-1] at 22. Mr. Grodnick responded on March 26, 2014 that the city's insurance committee would be meeting the next day to approve the settlement. *Id.* Mr. Grodnick also pointed out to Mr. Mitchell that he believed the decedent's estate did not have a personal representative and one would need to be appointed. *See id.* Mr. Grodnick advised Mr. Mitchell that the following week was the last week Mr. Grodnick would be employed by Defendant. *See id.* The same day, Mr. Grodnick received an e-mail from Mr. Mitchell's office that provided the order appointing a personal representative in the probate case and letters of administration. *See id.* at 24-26. Mr. Mitchell was advised on March 27, 2014 that the city's insurance committee approved the settlement. *See id.* at 28. Later that day, Mr. Grodnick sent Mr. Mitchell a draft settlement agreement and indicated asked him to review and let him know if it was acceptable. Mr. Grodnick also indicated he was "preparing the letter etc." *Id.* at 30. On March 28, 2014, Mr. Grodnick sent Mr. Mitchell an e-mail of a revised settlement agreement. *See id.* at 43. On March 31, 2014, Mr. Grodnick sent Mr. Mitchell an e-mail with an attachment "lettertonunez.docx" asking Mr. Mitchell to "[p]lease review the draft letter." *Id.* at 53.

On April 3, 2014, Mr. Mitchell sent an e-mail to Mr. Grodnick indicating that "the family wanted to see if we can meet tomorrow at 3:30pm rather than 10am. Please confirm." *Id.* at 58.

Mr. Grodnick replied: "[y]es. Lorena and I will be present to meet the family, sign the settlement agreement and deliver the settlement check." *Id.* On April 4, 2014, Mr. Mitchell forwarded an e-mail containing a "Notice of Service of Court Documents" indicating that a "Document Title: Notice:" was filed, to which Mr. Grodnick replied: "[t]he City will be enforcing the agreement." *Id.* at 62. The document was a "Notice of Charging Lien" filed in state court by Mr. Mitchell on April 4, 2014. *Id.* at 64.

On April 11, 2014, Defendant City of Hialeah filed a Notice of Removal, ECF No. [1], and filed the instant Motion on April 18, 2014. The Motion was referred to Magistrate Judge Jonathan Goodman, and after recusal, was reassigned to Magistrate Judge Chris M. McAliley. *See* ECF Nos. [14], [22]. The Motion was then referred to Magistrate Judge Alicia O. Valle after the case was reassigned to the undersigned. *See* ECF Nos. [28], [30]. After Judge Valle conducted an evidentiary hearing on August 20, 2014, the Motion was reassigned to Magistrate Judge Barry S. Seltzer after Judge Valle's recusal. *See* ECF No. [40]. Plaintiff thereafter filed an Amended Complaint. *See* ECF No. [43]. The parties then filed a Joint Motion to Stay on October 6, 2014, and the Court administratively closed the case on October 7, 2014. *See* ECF No. [49]. The Court re-opened the case on February 2, 2015, in order for the undersigned to consider the pending Motion. *See* ECF No. [56].

**II.   Discussion**

"[A] district court has inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case." *Ford v. Citizens & S. Nat'l Bank*, 928 F.2d 1118, 1121 (11th Cir. 1991). Florida law governs the issue of whether the parties reached an enforceable settlement agreement. *See Londono v. City of Gainesville*, 768 F.2d 1223, 1227 (11th Cir. 1985). Settlement agreements need not necessarily be in writing to be enforceable.

*See BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1132 (M.D. Fla. 2007). "Settlement agreements are favored as a means to conserve judicial resources. Courts will enforce them when it is possible to do so." *Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2002) (citing *Long Term Mgmt., Inc. v. Univ. Nursing Ctr., Inc.*, 704 So. 2d 669, 673 (Fla. 1st DCA 1997)). "They are interpreted and governed by the law of contracts." *Id.* (citing *Williams v. Ingram*, 605 So. 2d 890 (Fla. 1st DCA 1992)). "To compel enforcement of a settlement agreement, its terms must be sufficiently specific and mutually agreed upon as to every essential element." *Id.* (citing *Don L. Tullis and Assoc., Inc. v. Benge*, 473 So. 2d 1384 (Fla. 1st DCA 1985)). "Uncertainty as to nonessential terms or small items will not preclude enforcement of a settlement agreement." *Id.* (citation omitted). "However, '[t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." *Id.* (quoting *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974)). "The party seeking to enforce a settlement agreement bears the burden of showing the opposing party assented to the terms of the agreement." *BP Prods.*, 469 F. Supp. 2d at 1133 (citing *Carroll v. Carroll*, 532 So. 2d 1109 (Fla. 4th DCA 1988)). Competent substantial evidence must support a finding of a meeting of the minds between the parties. *Id.* (citing *Long Term Mgmt.*, 702 So. 2d at 673).

"In Florida, the party seeking to enforce the settlement agreement must establish that counsel for the opposing party was given the clear and unequivocal authority to settle the case by his or her client." *Id.* (citing *Spiegel*, 834 So. 2d at 297). Factors to determine whether clear and unequivocal authority existed include:

> 1) whether the client knew his lawyer was in the process of negotiating a settlement; 2) whether and how many times the client met or spoke with his

>attorney while settlement negotiations were ongoing; 3) whether the client was present in the courtroom when the settlement was announced in open court; 4) whether the client immediately objected to the settlement; and 5) whether the client was an educated man who could understand the terms of the settlement agreement.

*Id.* (citing *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483 (11th Cir. 1994)).

Defendant argues that "the Settlement Agreement and General Release was legally binding on March 28, 2014, at the moment Mr. Grodnick accepted Plaintiff's changes and had the requested changes incorporated into the agreement and e-mailed to Mr. Mitchell." ECF No. [6] at 9 (citing ECF No. [6-1] at 44-51). The record, however, shows otherwise. The purported agreement in this case had three key components: 1) payment of $140,000 by Defendant to Plaintiff, 2) a general release, and 3) an apology letter from Defendant. On March 28, 2014, the language of the apology letter was not finalized, and the letter was "critical" to the purported settlement. *Id.* at 54; ECF No. [42] at 27, 80-81. Thus, Defendant's argument that the purported settlement agreement became legally binding on March 28, 2014 fails because there was no mutual agreement as to every essential element of the settlement. *See Spiegel*, 834 So. 2d at 297.

Further, there is insufficient evidence that Mr. Mitchell had clear and unequivocal authority to enter into the settlement agreement after March 28, 2014. For example, Plaintiff flatly denies giving Mr. Mitchell authority to settle. Plaintiff testified that he never gave Mr. Mitchell authority to settle the case for $140,000 before Mr. Mitchell presented with a closing statement reflecting that amount and settlement papers for him to sign on April 1, 2014. *See* ECF No. [42] at 126. Plaintiff testified that he did not sign the closing statement or any of the other documents Mr. Mitchell gave to him, but that he "would take the documents and that somebody that knew about this could review them for me." *Id.* The Plaintiff discharged Mr. Mitchell the day of the scheduled meeting.. Rather than sign the documents, Plaintiff testified

that he and his family decided to change attorneys "because we didn't feel that he had represented us adequately." *Id.* Plaintiff testified that the basis of discharging Mr. Mitchell was that "[t]he communication we had with Mr. Mitchell was very bad. He did not represent us as he should have, and he took the decision without consulting with the family about the settlement statement." *Id.* at 127.

Mr. Mitchell's testimony paints a different picture with respect to authority before April 1, 2014. Mr. Mitchell testified that Plaintiff gave him authority to speak on his behalf during their second meeting together in 2012, "whether it was for settlement purposes, whether it was for investigative purposes." *Id.* at 73. Mr. Mitchell testified that this authority continued when Mr. Mitchell first rejected Defendant's offer for $100,000 during a phone conversation—without communicating the offer to Plaintiff, *id.* at 98-99—and through March 20, 2014, when Mr. Mitchell explained to Plaintiff that Defendant agreed to the framework of change in policy, the written affirmation, and a payment of $140,000. *Id.* at 74. Mr. Mitchell further testified that Plaintiff at that time added two more "non-monetary terms:" a medical examiner's report and for the city to "facilitate the personal belongings of the decedent because it was still in their possession." *Id.* at 75. Mr. Mitchell testified that he told Plaintiff he did not believe that would be a problem, but that he would call Plaintiff if there was a problem, and "plus there are some settlement documents that are going to have to be executed." *Id.* Mr. Mitchell testified that Plaintiff expressed an agreement to the $140,000 amount and conveyed a willingness to enter into the settlement agreement. *Id.*

Yet, there are significant consistencies between Mr. Mitchell's testimony and Plaintiff's. Mr. Mitchell testified that Plaintiff and Bismark Nunez came into his office, on April 1, 2014, when Mr. Mitchell had the release and the incorporated settlement agreement. *Id.* at 78. Mr.

Mitchell explained that he went through the release and settlement agreement with Plaintiff and Bismark Nunez "line by line and paragraph by paragraph." *Id.*  Mr. Mitchell also "highlighted the objectionable language" in the apology letter, Plaintiff agreed that the language should be removed, and "then there was a telephone conversation with the city attorney because the city attorney had or [he] had called while the family was there, and we were discussing the letter." *Id.* at 81.  Mr. Mitchell testified that he told Mr. Grodnick during that phone call that they had a deal because the case was settled.  *Id.* at 85.  Mr. Mitchell's testimony continues:

> So Jorge had told me that he wanted to bring the release and settlement agreement with him. . . So I said, ["]Okay."  I said, "do you want to just, instead of going back to my office,' I said, "do you want to go down to the city attorney's office and execute the documents there?" And he says, "Yes."  Now, I didn't have a final letter because we objected to that one sentence.  So I couldn't give him this letter when he left because it wasn't in final form, but he did take the settlement agreement and my closing statement, and of course, the release because it is incorporated. . . . He didn't take the draft apology letter because the apology letter wasn't in final letter.

*Id.* at 81-82.  In response to the Court's question regarding the rationale behind objecting to the letter's language, Mr. Mitchell responded: "I don't think that we wanted to degrade the decedent in the context of everything that had happened."  *Id.* at 84.[2]

Mr. Mitchell testified that Plaintiff was not willing to sign the closing statement during the April 1st meeting because "[h]e wanted to take it to the rest of the family members which is understandable."  *Id.* at 106.  When asked on cross-examination about not getting Plaintiff's signature or anything in writing, Mr. Mitchell responded:

> Counsel, you know and I know that there is no standard saying either.  There has to be a written communication, whether it is an e-mail or a letter.  I will be frank with you.  I took Jorge's word for it because of the prior interactions I had with him and his son.  I took his word for it, you know.  That is what I did.

---

[2]  The final letter, signed by Mr. Grodnick, is dated April 3, 2014.  *See* ECF No. [6-1] at 56.

*Id.* at 108. Mr. Mitchell confirmed that Plaintiff never executed any of the documents, and that less than one hour before the scheduled meeting on April 4, 2014 with Mr. Grodnick—to execute the agreement and deliver the settlement check—Mr. Mitchell was discharged. *Id.*

Based on the evidence in the record, Defendant has not sufficiently shown that Plaintiff had given Mr. Mitchell clear and unequivocal authority to settle the case after March 28, 2014. Mr. Mitchell recognized that on April 1, 2014, Plaintiff was not willing to sign the closing statement and wanted to review the documents with the rest of his family members—something Mr. Mitchell even regarded as "understandable." Whether Mr. Mitchell's authority was to settle the case was clear and unequivocal on April 1, 2014 may have been more evident if Plaintiff had executed the documents and brought copies home to his family to review them, but that was not the case here. *See id.* at 106. Taking Plaintiff's "word for it" that he would come back to execute the documents at the April 4, 2014 meeting is not a sufficient basis to find that Plaintiff gave clear and unequivocal authority to settle the case after March 28, 2014. Further, Defendant has not presented evidence that Plaintiff was aware of Mr. Mitchell's statement to Mr. Grodnick that the case was settled during the April 1, 2014 phone call—thus showing no basis that Plaintiff was aware of any execution of the agreement or had an opportunity to immediately object. Mr. Grodnick also never received any notification that the signed apology letter on April 3, 2014 was accepted. Nor is there sufficient evidence that the Plaintiff reviewed and approved the apology letter – a critical component of the settlement agreement. Thus, Defendant has not sufficiently shown that at any time was there a settlement agreement that was executed with the clear and unequivocal authority of Plaintiff.[3] Defendant's motion is accordingly denied.

---

[3] The Court also notes that Plaintiff became the personal representative for the decedent's estate on March 3, 2014. *See* ECF No. [6-1] at 25. The proposed settlement agreement contains two signature lines: one for Plaintiff as personal representative and the other for Bismark Nunez (the decedent's father) individually. *See id.* at 50. The proposed settlement agreement also refers to Bismark Nunez, individually "and as survivor of the Estate." *Id.* at 44.

III.   **Conclusion**

For these reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant City of Hialeah's Motion to Enforce Settlement Agreement, **ECF No. [6]**, is **DENIED**;

2. Defendants shall answer or otherwise respond to Plaintiff's Amended Complaint, ECF No. [43], **on or before March 23, 2015**;

3. A separate amended scheduling order setting the date for trial and other deadlines will follow.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 11th day of March, 2015.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record

---

The proposed settlement agreement, however, excludes the decedent's mother, Brunilda Nunez, who was listed as a beneficiary of the estate in the petition for summary administration, which was submitted in state probate court in 2012.  *See* ECF No. [6-1] at 4.  Mr. Mitchell also testified that he never met her because he "had full communication with Jorge," though he did meet with Bismark. ECF No. [42] at 109-10.